

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable C. R. Miller, Commissioner
Texas Unemployment Compensation Commission
Austin, Texas

Dear Sir:

Opinion No. O-2645
Re: Industrial life insurance
agents in employment of a
life insurance company
within the meaning of the
Unemployment Compensation
Act -- Prior to April 1,
1939 -- Subsequent to
April 1, 1939.

We received your letter dated August 16, 1940,
requesting our opinion on certain questions based upon cer-
tain given facts. We quote from the statement of facts,
which you enclosed in your letter, as follows:

"Industrial life insurance agents, here-
after called agents, are those agents who sell
industrial insurance. Industrial insurance,
as opposed to ordinary life insurance, is in-
surance the premiums for which are collectible
weekly and collected weekly by the agents. In-
dustrial insurance is not spoken of in terms
of the face value of the policy, but rather in
terms of the amount of weekly premium. Thus,
a policy in the industrial class is referred
to as a 25¢ debit rather than a $500 policy.

"The organization of the company insofar
as here pertinent consists of a home office
and district offices. In charge of the dis-
trict office is a district manager. Under
the district manager are superintendents,
four or five in number. Under each super-
intendent is a group of industrial agents con-
sisting of four or five men. The manager is
responsible for the whole district. The super-
intendent is responsible for a division of the

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable C. R. Miller, Page 2

district. The agent is responsible for a subdivision of the superintendent's area.

"Each agent is furnished with a debit book which contains the names and addresses of all policy holders within his debit or area of operations, as well as the policy numbers of all of the policies the premiums on which he is charged with the duty of collecting. The debit book is arranged in such a way as to set forth the actual route over which the agent travels in the collection of these premiums.

"On Monday, Tuesday and Wednesday of each week, the agent makes collections. He calls upon the policy holder indicated by the first page of his debit book; he then calls upon the person indicated by the second page, and so on; He travels over his specified route by any means available to him and collects the weekly premiums due. The fact that he is so engaged on these days does not mean that he is not likewise charged with the duty of selling insurance, both industrial and ordinary insurance, on these days and every other day. On Thursday, Friday and Saturday the agent devotes his time generally to the sale of insurance of both types. On Saturday, however, at least the first half of the day is devoted to office work. This Saturday office work consists of the agent's setting up of his new business, putting such new business on folio sheets in his folio and scratching off of the register his lapsed sheets. These latter sheets are sheets with reference to business which is dead because of the policy holder's failure to pay premiums. Likewise on Saturday morning policies are placed in envelopes along with receipt books, and folios are balanced to arrive at the amount of the debit of the agent for the week beginning the following Monday morning. The amount of the agent's debit is arrived at by subtracting his lapsed business from his new business.

Honorable C. R. Miller, Page 3

"Each morning, except Monday morning, the agent is required to be present at a meeting held at 7:45 a.m. At such meeting the agent takes his place at his assigned desk in the company office, to be addressed by the district manager and two other individuals connected with the company selected by the manager for the purpose. At these meetings a roll call is first had. Each agent responds to his name with, first, a statement of the amount of industrial insurance written on the previous day (in terms of the amount of weekly premiums); second, the amount of ordinary insurance written on the previous day; third, collections on industrial policies for the previous day; and, fourth, collections on ordinary insurance for the previous day. In addition to these statements, the agent is required to announce and does announce his pledge of accomplishment for the day during which he is answering roll call. Thus, he announces on Tuesdays and Wednesdays the amount of collections he expects to make on those days, as well as the amount of insurance he expects to write. On Thursdays, Fridays and Saturdays he announces merely his pledge quota or expected business in the matter of selling insurance, no reference being made to collections because collection duty covers only the first three days of the week. If an agent is late in arriving at such meeting he is held up to ridicule by the manager. If it is necessary for him to be absent from such meeting he communicates that fact to the manager by telephone or other means.

"Upon the adjournment of this meeting during which the manager has made urgent request that the superintendents and agents get business, each superintendent ordinarily gathers with a group of agents in a restaurant for coffee. At this time business is again discussed and each agent is told by the superintendent the exact time and the exact place

Honorable C. R. Miller, Page 4

at which he, the superintendent, will meet the agent on the agent's route that day. The agent then goes to his delineated area to perform his functions, his route arranged for him by the arrangement of the pages in his debit book. Those pages indicate to him the next address at which to call. The debit book contains so many pages that collections are only half covered on the first day, Monday, the remaining portions being covered on Tuesday. The manager, as well as the superintendent and agent, is perfectly familiar with the debit area indicated by each debit book.

"The agent makes his collection and meets the superintendent at the appointed time and place, at which time he advises with the superintendent as to any particular problem which confronts him. In some instances the superintendent offers and gives assistance in the matter of transporting the agent to some address at which the agent has previously called in his morning rounds but failed to collect. At times policyholders moved from the debit area of one agent to the debit area of another. In such instances the superintendent may take the agent with him to check on such removal and the new location of the policy holder. The agent then collects that week's premium, the policy later being transferred to the debit of the agent in whose territory the policy holder has newly located.

"After leaving the superintendent the agent then goes on with his collections. This collection duty ordinarily requires that the agent work until approximately 9:00 p.m. each night. This is due to the fact that an agent, to retain his connection with the company, must produce 95% collections, plus a specified increase in his business. The amount of required increase in business is set by the company, usually $1.00 per week of premiums collectible. The one contact with the superintendent mentioned does not mean

Honorable C. R. Miller, Page 5

that the agent will not be contacted again during the day. The superintendent is familiar with each agent's debit to the point of knowing approximately where the agent is working at any particular time. Very often the superintendent again contacts the agent to see that he is actually performing his duties.

"On Wednesday morning of each week the final collection duties are done, that is, all collections not made on Monday or Tuesday are attempted to be made on Wednesday morning. On Wednesday afternoon the agent works in the company office checking up his accounts. At that time he turns in the money which he has collected during that day, having each day previously turned in the amount of money collected on those days. He likewise turns in receipts for the collections previously handed the company, which makes a full account of the week's collections. This account is balanced against the figure which he arrives at by subtracting lapsed policies from new policies, and premiums in arrears from advance premium payments. He thus arrives at the amount which is due from him to the company. On Wednesday night as well as on Thursday and Friday, including Thursday and Friday nights, the agent sells new policies. On Saturday morning in the office he checks his possible lapsed policies, that is, those policies which would lapse if not paid on that day, and on Saturday evening, preferably around dinner time, attempts to collect these accounts.

"The compensation of the agent is in terms of twenty times the amount of business written and 20% of the collections which he makes. Thus, if an agent sells a policy the premium for which is 25¢ per week, he is credited on the books of the company with twenty times 25¢. Likewise, when he collects the 25¢ per week he is, on each occasion, credited with twenty percent of 25¢. This

Honorable C. R. Miller, Page 6

apparent asset on the agent's record with
the company is offset by a charge-back to
the agent of twenty times his lapsed business.
Thus, if a 25¢ premium is due on a policy
which lapses, that is, is not collected with-
in thirty days of the due date of the weekly
premium, the agent's record with the company
reflects a charge to him of twenty times 25¢.
These figures are important in arriving at
the agent's wages which, for any particular
week, are actually figured on Wednesdays.
The statement above is qualified by the fur-
ther statement that the agent is not actual-
ly paid the full amount of twenty times his
debit. Instead, he is paid a stipulated per-
centage thereof, probably 15%. The balance
is held by the company to his credit.

"Each week the agent is charged with an
amount, usually two or three dollars, which
is held out of his wages and is placed in
what is termed the agent's bond account. No
actual bond is issued, but the company builds
up a bond account in order to take care of and
to offset any shortage on the part of the agent.

"It can be seen that it is possible for an
agent to be entitled to no cash money on pay
day, which falls on Saturday. An agent in that
situation who needs money on any particular pay
day may and often does make arrangements with
the manager for an advance. His wage slip
therefore reflects that his total remuneration
for the week is paid under an item denominated
'special salary.' His special salary may be
and usually is paid even though his account
with the company shows that he is actually 'in
the red.' This special salary is an ordinary
item of wages in that it is paid each week;
however, the amount of such special salary
varies from five to twenty dollars, accord-
ing to the achievements of the agent during the
week. If the agent has done well he may be
paid twenty dollars special salary; whereas,
poor accomplishment will merit him only five

Honorable C. R. Miller, Page 7

dollars special salary. In other cases the
agent will be credited with a special salary
over and above the amount which his accomplish-
ment would ordinarily permit. This increase
in the particular agent's special salary us-
ually results in a decrease of the special
salary of some other individual or individuals.
This is due to the fact that there is usually
available to the district manager only a certain
amount of money which can be used for special
salary payments."

Based upon the above facts, you ask the following
questions which we quote from your letter as follows:

"Are the industrial insurance agents
treated in the statement of facts attached
hereto in the employment of the life insurance
company under Article 5221b-17(g), V. R. C. S.
1925, in its present form and/or as it existed
prior to amendment effective April 1, 1939?"

We will first discuss the question of whether or
not the industrial insurance agents were in the employment
of the life insurance company within the meaning of the Un-
employment Compensation Act, infra, prior to its amendment
effective April 1, 1939. We do not think it necessary to
discuss the general provisions of the Act relating to em-
ployment insofar as this question is concerned because prior
to April 1, 1939, the Act contained a specific provision
which, we believe, controls this question. This provision,
Subsection (g) (9) of Section 19 of the Texas Unemployment
Compensation Act, same being Acts 1936, 44 Leg., 3rd C. S.,
ch. 482, p. 1993, was as follows:

"(9) In determining employees under
this Act and in determining employers under
this Act, and in determining wages under
this Act, neither term shall include em-
ployment of or service by agents of in-
surance companies who collect their com-
pensation on a commission basis." (Repealed
April 1, 1939).

There would seem to be no doubt but what the in-
dustrial insurance agent in question was an agent within

Honorable C. R. Miller, Page 8

the meaning of the above quoted section of the Act.

This being true, the question arises as to whether the remuneration received by the agent is in the form of a commission.

It can readily be seen that an agent might not be entitled to any compensation on pay day due to the commission plan of payment which the insurance company has in force. To meet this situation, the company has a plan whereby the agent may obtain an advance. This is more fully explained in the facts hereinabove mentioned. If this advance is charged against the commissions earned by the agent, then it cannot be said that he receives any compensation other than on a commission basis.

Under these facts, we are of the opinion that the agents in question, prior to April 1, 1939, were not in the employment of the life insurance company.

However, if these particular weekly payments are not charged against the commissions earned by the agents, then they must be something other than loans or advances on commissions. This being true, what we have said in answer to your first question would not be applicable.

Before passing to the second question, we wish to comment on Regulation No. 37, (now Regulation No. 33) promulgated by the Commission, which, we believe, is in conflict with what we have heretofore said. This Regulation reads, in part, as follows:

"All employees of insurance companies and corporations are 'subject' employees, except agents, as hereinafter set out.

"Agents for the purposes of this exception are those individuals commissioned by insurance companies or corporations to represent them in the sales of insurance of any sort whose remuneration consists only of commissions on the amount of the aforesaid sales." (Underscoring ours)

The above Regulation provided, in substance, that

insurance agents are exempt employees only when their remuneration consists of commissions on the sale of insurance. The Act provided that insurance agents "who collect their compensation on a commission basis" are exempt employees. Under the facts set out herein, the agent receives a commission for the collection of certain weekly premiums. Under the provisions of the Act prior to April 1, 1939, he was an exempt employee since the commission would be a part of his compensation. It would seem, however, that if we should look to the Regulation of the Commission alone, the agent would not be an exempt employee because the commission was earned on something else, to-wit: collection of premiums. To the extent that Regulation No. 37 conflicted with the heretofore quoted section of the Act, the latter governed until its repeal.

The special provision of the Act exempting insurance agents who were compensated on a commission was not incorporated in S. B. No. 21, Acts 1939, Regular Session, 46th Leg., ch. 2, p. 436, which became effective April 1, 1939, and now codified as Articles 5221b-1-23, inclusive, of Vernon's Annotated Civil Statutes. Therefore, we must look to the general provisions of the Act to determine if the agent in question is in the employment of the insurance company.

Article 5221b-17 (g) (1), supra, defines employment as follows:

"(g) (1) 'Employment' subject to the other provisions of this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied, provided that any services performed by an individual for wages shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the Commission that such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact."

Article 5221b-17 (o), Vernon's Annotated Civil Statutes, defines wages as follows:

Honorable C. R. Miller, Page 10

"(o) 'Wages' means all remuneration
payable for personal services, including
commissions * * *."

There can be no doubt but what the agent renders
a service to the company. There can be no doubt but that
he receives "wages" as a consideration for the performance
of said service. The agent is clearly in the employment
of the insurance company unless it can be shown that he
"has been and will continue to be free from control or
direction over the performance of such services both un-
der his contract of service and in fact."

We quote from the case of Creameries of America,
Inc., v. Industrial Commission, et al, 102 P. (2d) 300,
Supreme Court of Utah, as follows:

"Subdivision (5) of subsection (j) pro-
vides, that,

"'Services performed by an individual
for wages shall be deemed to be employment
subject to this act unless and until it is
shown to the satisfaction of the commis-
sion that --

"'(a) such individual has been and will
continue to be free from control or direction
over the performance of such services, both
under his contract of service and in fact;
and

"'(b) such service is either outside
the usual course of the business for which
such service is performed or that such serv-
ice is performed outside of all the places
of business of the enterprise for which such
service is performed; and

"'(c) such individual is customarily
engaged in an independently established trade,
occupation, profession or business.'"

At page 306, the following language is found:

Honorable C. R. Miller, Page 11

"* * *. The claimant was required to purchase a truck which met the approval of the company, which truck had to be painted in a certain manner and bear the company's name thereon. Claimant was required, it might reasonably have been found, to sell the company's products at a certain price, including certain 'specials' which were 'pushed' by the company occasionally. The prices paid by claimant for both 'specials' and regular products were fixed by the company, such prices having a direct relationship to the price for which such products could be sold. Claimant was required to keep his truck at the company garage, and repairs were made thereon by the company and charged to claimant without his knowledge or consent. Books of account were supposed to be kept by claimant which books were required to be left at the office of the company unless consent was obtained to take them home. The company maintained a special bank account for claimant and deposited the money collected from customers. Claimant's check book, used to draw on said bank account, was required to be left at the office. The company had a right to inspect claimant's route and did so inspect it by maintaining a relief man who occasionally relieved claimant. This relief man, who was an employee of the company, made reports to the company on the condition of claimant's route. Some collections from customers on claimant's route were also made by a relief man who turned into the company all sums so collected. In addition to the above, the company made 'suggestions' and 'offered advice' as to how claimant should increase sales, make collections, etc. The contract under which claimant performed his services could be terminated by the company at any time upon two weeks' notice or within 24 hours where a 'technical' breach of the contract had been made.

Honorable C. R. Miller, Page 12

"While there is dispute in the evidence
as to some of the above facts, the evidence
in the record clearly discloses that the
commission might reasonably have found that
the claimant was not free from 'control'
and 'supervision' under his contract with
the plaintiff and in fact."

In the case of Salt Lake Tribune Pub. Co. v. In-
dustrial Commission, et al, 102 P. (2d) 307, Supreme Court
of Utah, newspaper carriers were held to be in the employ-
ment of the publisher under the same definition of employ-
ment as set out in the Creameries of America case, supra.
We quote from the Salt Lake Tribune case, supra, as follows:

"The contract itself provided that the
company could terminate the relationship
between it and the carrier at any time
'with or without cause' by giving fifteen
days' notice. The evidence further shows
that the subscribers were the customers of
the company rather than of the individual
carriers. A carrier received nothing from
his route other than what was received by
the distribution of newspapers to sub-
scribers during the life of his contract
with the company. At the termination there-
of all paid in advance subscriptions had to
be turned over to the company, together with
a list of all subscribers who continued to
receive the newspaper from some other car-
rier. In its effort to maintain these sub-
scribers and obtain new ones, the company
was continually offering inducements to the
carriers, 'supervising' their work, and re-
quiring them to do particular acts designed
to effectuate the ends of the company.

"While there is also some evidence in
the record to the effect that the company
had no right to, and did not in fact, ex-
ercise any 'control or direction over the
performance' of the services performed by
Cushing, still the evidence set out above
is ample to support the finding of the Com-
mission that 'the claimant in this case
was not free from direction and control
over the performance of service rendered

under his contract'. At all events the
evidence is such that we cannot say that
the Commission must, as reasonable men,
have found that claimant was free from
such control."

In Industrial Commission v. Northwestern Mut.
Life Ins. Co., 88 P. (2d) 560, Supreme Court of Colorado,
the question was whether an agent of a life insurance com-
pany was in employment of the company within the meaning
of the Unemployment Compensation Act of that State. The
definition of employment is the same as is set out in the
Creameries of America case, supra. The Court said:

"In the preface to the 'Rules and Reg-
ulations,' which are a part of the contracts
herein, we find this language: 'It is self-
evident that a business involving such enor-
mous detail as that of a large life insurance
company cannot be conducted in a haphazard
way. There must be definite rules by which
each detail will be carried to completion.
Otherwise the various parts of the machine
will not work smoothly and friction and loss
of effort will result.'

"Here we have an admission of detailed
direction under contracts with the 'individ-
ual' involved herein. It would indeed re-
quire a revolutionary change in the conduct
of the life insurance business, as shown by
the evidence, to bring about a situation
whereby its agents would be free from any
control or direction."

In comparing the definition of employment in the
above cases with the definition of employment in the Stat-
utes of Texas, we find the definition is exactly the same
in each instance, with the exception that Sections (b) and
(c) as set out in the Creameries of America case, supra,
are not found in the Texas definition.

Some other cases involving this question are:
McDermott v. State, et al, 82 P. (2d) 568; Globe Grain &
Milling Co. v. Industrial Commission, et al, 91 P. (2d) 512;
Unemployment Compensation Commission of North Carolina v.
Jefferson Standard Life Ins. Co., 2 S. E. (2d) 584; North-

western Mut. Life Ins. Co. v. Tone, et al, 4 A. (2d) 640;
In Re Perdziak, 19 N. Y. S. (2d) 1000.

To determine whether the agent is free from control or direction of the insurance company, we refer back to the facts. We find that the agent must attend a meeting every morning, except Monday, at a given time. He must report back to the office after he has finished his days work. If he is late for the morning meetings, he is held up to ridicule by the manager. If unable to be present at a meeting, he notifies the manager. He collects premiums on certain days and follows a given route in so doing. A company superintendent often checks up on the agent to see if he is performing his duties. He must collect a certain amount to keep his job. He must make out certain reports at certain specified times.

From the above facts, it is obvious that the agent is subject to some kind of control or direction.

In the case of American Nat. Ins. Co. v. Denke, et al, 95 S. W. (2d) 370, the Commission of Appeals held that an insurance company was not liable for the negligent act of the agent in the operation of his automobile while soliciting new business. The facts in this case are practically the same as those involved here. The court held that the principal did not have that type of control over the agent which would render the principal liable for the agents negligence.

We do not believe that the above case is controlling of the question involved here. If the Legislature had wanted these agents exempted, why did it repeal the very provision which exempted them? We think the language found in the Creameries of America case, supra, is enlightening. We quote as follows:

"* * *. The fact that neither the term
'employee' nor the term 'independent contractor'
is used any where in the Unemployment Compensation Act is itself indicative that the legislature did not intend to use the relationships of 'independent contractor' or 'employer-employee', as defined by the common law, as the criteria to determine who are entitled to benefits under

Honorable C. R. Miller, Page 15

the Unemployment Compensation Act. The word 'individual' is used throughout the Act to refer to the person seeking unemployment benefits. While the terms 'employer' and 'employing unit' are used, they are specifically defined by the Act so that they have a distinct meaning which may or may not coincide with the ordinary conception of 'employer.' * * *."

In our Opinion No. O-1290, some language was used which might be taken to indicate an opinion that the common law principles laid down in our master and servant cases might be looked to for the purpose of determining whether or not a person is an employee within this Act. That, however, is not necessarily true. While an employee under that line of cases would undoubtedly be an employee within the Act, we do not believe that the converse would always be true.

For the reasons herein given, we are of the opinion that the agent in question is and has been since April 1, 1939, in the employment of the insurance company within the meaning of the Texas Unemployment Compensation Act.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By *Glenn R. Lewis*

Glenn R. Lewis
Assistant

By *Lee Shoptaw*

Lee Shoptaw

LS:RS

APPROVED SEP 12, 1940

*Gerald C. Mann*

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
BY BWB